# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**PETER CASTELLINI, et al.,**

    **Plaintiffs,**

    v.

**SKYLINE CHILI, LLC, et al.,**

    **Defendants.**

Case No. 1:23-cv-141

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

Defendants—Skyline Chili, James Blake, Adam Schacht, and Tina Smith—have all moved for summary judgment in this employment dispute. (Docs. 34, 35). Their motions—which are bifurcated to argue individually with respect to both Plaintiffs, Peter and Mary Ellen Castellini—seek summary judgment as to all of Plaintiffs' claims. For the reasons described below, the Court **GRANTS** the Motions (Docs. 34, 35).

## BACKGROUND[1]

The chili-making business can get heated. Or, at least, that seems to be the case at Defendant Skyline Chili's Loehmann's Plaza location. That's where this acrimonious dispute bubbled up. Plaintiffs Peter and Mary Ellen Castellini both

---

[1] In recounting the factual background of this case, the Court relies, where possible, on the parties' agreed undisputed facts, submitted as part of their briefing on the motions for summary judgment as directed by Standing Order I.F.2, available at https://perma.cc/S2YS-S7ZP. (Doc. 34, #708–10; Doc. 35, #743–45). Where those facts are insufficient—as they often are, since the parties' record citations leave much to be desired—the Court will cite directly to undisputed record evidence. And wherever discussed, disputed facts will be clearly indicated as such.

worked at that location from June 2021 through September 2022 as a dishwasher and server, respectively. (Second Am. Compl., Doc. 14, #206; Peter Castellini Dep., Doc. 23, #271; Mary Ellen Castellini Dep., Doc. 25, #365–66). They worked *with* Defendant Tina Smith (another server) and *under* Defendants James Blake (the then-general manager, since dismissed for unrelated conduct) and Adam Schact (the then-senior district manager for the Cincinnati market, since elevated to another corporate role at Skyline). (Smith Dep., Doc. 29, #552; Shacht Dep., Doc. 31, #589, 592).

The record suggests that Plaintiffs' time at Skyline was contentious. Start with the Castellinis' relationship with general manager James Blake. Blake joined Skyline in June 2022, midway through the Castellinis' time there. (*See* Blake Dep., Doc. 27, #522). Plaintiffs insist (although Blake disputes) that Blake: (1) stole their tips and/or wages, (Doc. 23, #292, 297; Doc. 25, #380–81; 392); (2) sexually harassed female employees by joking inappropriately about "wieners" (in the context of Skyline's famed Coney chilidogs), (Doc. 23, #283–84, Doc. 25, #379–80, 392); (3) abused drugs on the job, (Doc. 23, #279, 302, Doc. 25, #392); and (4) conspired with Tina Smith (more on her later) to get them fired, (Doc. 23, #290, Doc. 25, #384, 386, 399).

The bad blood between the Castellinis and Blake seems to be what started the saga that concluded with their firing. First, the Castellinis participated in and provided statements for an investigation into Blake's allegedly sexually inappropriate conduct, (Doc. 23, #282; Doc. 25, #383)—which, according to Defendant Schacht, didn't produce any actionable findings. (Doc. 31, #594–95). Second, they complained that Blake undercounted their hours (in Peter's case) or stole their tips

2

(in Mary Ellen's case)—both of which complaints, as the Castellinis admit, again resulted in no action on Skyline's part. (Doc. 23, #297; Doc. 25, #381). Then, with their relationship already simmering, the events of August 30, 2022, brought things to a boil. That day, Peter submitted a letter to his supervisors alleging Blake solicited drugs from him: "James [Blake] aproched [sic] me while I was washing dishes, pulled out his walet [sic] ..., then asked me if he could buy some of my wife's medical marijuana." (Doc. 23-3, #348).

Once again, Skyline investigated. But in the course of doing so, much to Peter's dismay, the spotlight turned onto Peter himself. Dustin MacDonald (an intermediate corporate manager, not a party to this case) interviewed Peter about his allegations. And during that interview, Peter admitted that he had brought marijuana onto the premises. (Doc. 23, #286). That violated the company's drug policy. *(Id.;* MacDonald Depo., Doc. 33, #636). MacDonald reported that statement to HR, and the company decided to terminate Peter's employment, (Doc. 33, #636), which it did on September 2, 2022, (Doc. 35, #744; Doc. 37, #763).

But Peter's termination did not put an end to things. Perhaps unsurprisingly, Mary Ellen was upset by the turn of events resulting in her husband's sudden and involuntary departure from their shared workplace. She testified that "Peter's firing created just a lot of damage financially and emotionally and mentally." (Doc. 25, #376). Nonetheless, she maintains she continued to be "very professional [at work] after [Peter] was terminated." (*Id.* at #384). MacDonald, though, tells a different story. He testified that she was "rude" to Blake in the aftermath of these events, to

3

the extent that MacDonald held a joint meeting to set "expectations going forward" and to tell Mary that, "if she wanted to continue working, she still had to be respectful." (Doc. 33, #641). In the following days, Mary Ellen kept up her complaints against Blake. Specifically, she met with MacDonald to discuss a lengthy statement she had written complaining about Blake's alleged shortcomings as a manager. (Doc. 25, #383–84).

Then things got spicier still. On September 18, 2022, Mary Ellen got into an altercation with Defendant Tina Smith at work. (*Id.* at #384). According to Mary Ellen, she began her shift that morning with Tina and James Blake in an otherwise empty store. (*Id.*). Mary Ellen "saw them whispering" and interjected, jokingly (she says), that "[w]henever you two whisper someone either gets in trouble or fired." (*Id.*). That kicked off a longer exchange between Mary Ellen and Tina, culminating with Mary Ellen giving her "both … middle fingers" and mouthing (but not necessarily vocalizing) "FU." (*Id.* at #384–86). Other than that, though, Mary Ellen insists that she did not verbalize any curse words, did not behave threateningly, was not seen by any customers, and left the premises without incident after Dustin told her to do so (which happened after Tina and James reported the incident to him). (*Id.*).

Tina and James remember the events of that day somewhat differently. Tina, for her part, testified that Mary Ellen "ma[de] allegations that were untrue and threaten[ed her]." (Doc. 29, #552). Blake, meanwhile, testified that "[Mary Ellen] flipped us off and started screaming and yelling," and that she did so in front of

4

customers—not in an empty store. (Doc. 27, #526). But all parties agree that Mary Ellen was sent home afterwards.

That didn't end things. Tina says that later that night Mary Ellen (along with Peter) appeared at Tina's home *twice*, banging on the door and causing commotion. (Doc. 29, #553). The first visit occurred around 7:00 p.m. when Tina was away at her second job. (*Id.*). Only her daughter Caitlyn, who has special needs, was home. (*Id.*). According to Tina, a neighbor intervened and "told [the Castellinis] if they didn't quit, he was calling the cops; and they left." (*Id.*). But they returned. This time they arrived at around 2:00 in the morning. Tina was home by then. She testified that they "kept on screaming that they knew I was in there, and [to] come talk to them. I was not going to open the door for them. I just pretended that I wasn't home." (*Id.* at #554). Allegedly, the Castellinis were loud enough for long enough to earn Tina a noise complaint. (*Id.*). The Castellinis, on the other hand, vigorously deny visiting Tina's home that night. (Doc. 23, #292–93; Doc. 25, #389–90).

Two critical developments followed that fateful night. First, Tina went to the police, who advised her to obtain a protection order against the Castellinis. (Doc. 29, #554). Second, Mary Ellen committed herself to inpatient treatment for what appears from her testimony to be a flare-up of her PTSD, which in turn triggered some degree of alcohol abuse. (Doc. 25, #387–88) She claims this was all "due to the stress at work." (*Id.* at #388). Mary Ellen remained in treatment for about five days starting on September 21, 2022. (*Id.*). Once she returned to work, Skyline asked her if she'd like to transfer locations so as to avoid any further problems with Tina. (*Id.* at #392). She

5

declined that offer. (*Id.*). As a result, Tina followed the police's advice and filed for a protection order against Mary Ellen (but not against Peter, for procedural reasons). (Doc. 29, #555). After Tina filed in Hamilton County Court, Skyline decided to fire Mary Ellen. (*Id.*; Doc. 33, #638). It dismissed her on October 7, 2022. (Doc. 25, #390).

The Castellinis interpret their firings as Skyline either retaliating for their wage, hour, and sexual-misconduct complaints, or discriminating based on disability. So they sued, asserting a litany of claims. Specifically, their Second Amended Complaint presents claims for: (1) violating the Ohio Whistleblower Protection Act (the OWPA) (Count I); (2) wrongfully terminating them in violation of public policy (known as a *Greeley* claim, after the Ohio Supreme Court case that recognized the cause of action, *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990)) (Count II); (3) retaliating in violation of the Fair Labor Standards Act (the FLSA) (Count III); (4) retaliating in violation of the Ohio Constitution's minimum wage provisions (Count IV); (5) failure to accommodate, disability discrimination, and retaliatory discrimination in violation of the Americans with Disabilities Act (the ADA) and the Ohio Civil Rights Act (the OCRA) (Counts V, VI, VII, VIII, IX, XI, XII, XIII, XIV, and XV); and (6) aiding, abetting, and inciting discrimination (Counts X and XVI). (*See generally* Doc. 14).

Defendants have now moved for summary judgment on all of those claims. (Docs. 34, 35). Plaintiffs responded, (Docs. 37, 38), and Defendants replied, (Docs. 39, 40). So the matter is now ripe for the Court's review.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party carries that burden by pointing to specific, admissible facts in the record, the nonmoving party "must come forward with significant probative evidence to support its claim." *Kaivac, Inc. v. Stillwagon*, No. 1:19-cv-410, 2022 WL 7483134, at *2 (S.D. Ohio 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). And the Court must view the parties' factual claims in the light most favorable to the non-movant. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). If the nonmoving party does not carry its burden with respect to a claim—for example, by "fail[ing] to make the necessary showing for an element [of a claim] upon which it has the [ultimate] burden of proof"—then the moving party is entitled to summary judgment on that claim. *Kaivac*, 2022 WL 7483134, at *2.

While non-movants can lose at summary judgment by trying—but failing—to carry their burden as to a given claim, they can also "abandon" a claim by failing to try at all. That is, the Sixth Circuit has held that non-movants abandon their claims by failing to respond to the arguments that the movant presents in its motion for summary judgment. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 371–72 (6th Cir. 2013). But even then, courts should not grant a movant's request for summary judgment without "review[ing] carefully the portions of the record submitted by the moving party to determine" whether they have carried their initial burden to show that there is no genuine dispute of material fact and that they are entitled to

7

judgment as a matter of law. *Kaivac*, 2022 WL 7483134, at *2 (quotation omitted). Stated differently, "the party moving for summary judgment must meet his burden of production to prevail, regardless of whether the adverse party responds." *Bruin v. White*, No. 5:16-cv-105, 2021 WL 4303684, at *2 (W.D. Ky. Sept. 21, 2021) (citing *Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017)).

To put that all together, Defendants—as the movants here—bear "the initial responsibility of informing the [C]ourt of the basis for [their] motion [by] identifying those portions [of the record] … which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. If they make that showing, the burden shifts to Plaintiffs to point to evidence that "present[s] some remaining 'sufficient disagreement' which would necessitate submission to a jury." *Hentze v. CSX Transport., Inc.*, 477 F. Supp. 3d 644, 658 (S.D. Ohio 2020). If Plaintiffs don't make *any* attempt to do so, they have "abandoned" the claims with respect to which they forward no supporting evidence, but such abandonment does not result in an automatic grant of summary judgment to Defendants unless Defendants have independently carried their initial burden. *Bruin*, 2021 WL 4303684, at *2.

## LAW AND ANALYSIS

Plaintiffs Peter and Mary Ellen Castellini raised sixteen counts in their Second Amended Complaint. (Doc. 14). Many of those counts present nearly identical claims, altered slightly to accommodate both Plaintiffs' individual circumstances. For the sake of clarity, the Court will group its analysis by claim, and not by Plaintiff, and

8

discuss the effect of each Plaintiff's individual circumstances on its analysis where necessary.

Defendants move for summary judgment on all six categories of claims described previously. But many of those separate categories of claims share a common requirement—Plaintiffs ultimately must show that Skyline's non-discriminatory justifications for their firings are pretextual. *Bashaw v. Majestic Care of Whitehall, LLC*, __ F.4th __, 2025 WL 700169, at *4 (6th Cir. 2025). Because the Castellinis haven't created a genuine dispute as to that requirement, the Court starts there. After addressing the Castellinis' failing on that front, and the common impact it has on these various effected claims, the Court takes each remaining claim in turn. As to each, the Court determines whether Defendants have carried their initial burden to merit summary judgment and, if so, whether Plaintiffs have successfully countered such that their claims may proceed to a jury. While the Court presents the details below, the short answer is that none of the claims survive.

**A. The Castellinis Have Not Produced Any Evidence Casting Doubt on Skyline's Non-Retaliatory Justifications for Their Firings, As Required for Many of Their Claims.**

The overwhelming majority of Plaintiffs' claims share a common requirement: showing that Skyline's asserted justifications for their firings are mere "pretext" masking an unlawful purpose. *Bashaw*, 2025 WL 700169, at *4. But while the pretext requirement is common across these claims, it operates somewhat differently depending on which of two subsets each of the various claims occupies: (1) those that

9

are governed by the *McDonnell Douglas* burden-shifting framework, and (2) the so-called *Greeley* claims. So the Court will address each subset in turn.

### 1. The Castellinis' Evidence Doesn't Satisfy the *McDonnell Douglas* Pretext Analysis.

The bulk of the Castellinis' claims are of the sort analyzed under the *McDonnell Douglas* burden-shifting framework at the summary judgment stage. Specifically, the OWPA claim, the FLSA claim, the Ohio minimum wage claim, and the ADA and OCRA claims (for retaliatory discrimination and disability discrimination[2]) are all subject to that framework. *Klepsky v. United Parcel Serv., Inc.*, 489 F.3d 264, 271–72 (6th Cir. 2007) (explaining OWPA burden shifting); *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (explaining FLSA burden shifting); *Morse v. Fifty West Brewing Co.*, No., 2024 WL 1151794, at *2 n.3 (S.D. Ohio Mar. 18, 2024) (citing cases) (explaining that Ohio minimum wage claims are "analyzed under the same framework as the FLSA"); *Rorrer v. City of Stow*, 743 F.3d 1025, 1046, 1031 n.1 (explaining ADA burden shifting, and that OCRA claims are analyzed under the same standard); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319–20 (6th Cir. 2019). The Court will refer to those as the Castellinis' "burden-shifting claims."

The burden-shifting framework calls for a three-part analysis at the summary judgment stage. First, the plaintiff bears the burden of producing sufficient evidence to make out a prima facie case under the relevant law. *See, e.g.*, *Adair*, 452 F.3d at

---

[2] The remaining ADA/OCRA claims—for failures to accommodate—aren't subject to the *McDonnell Douglas* framework and are analyzed separately below. *See infra* Part B.

489 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973)). The requisite showing that a plaintiff "must make at the prima facie stage [i]s 'low' and 'minimal.'" *Spengler v. Worthington Cylinders*, 514 F. Supp. 2d 1011, 1022 (S.D. Ohio 2007). Second, if the plaintiff satisfies their burden of production, the burden shifts to the defendant to demonstrate that they had a "legitimate, non-discriminatory" reason for firing the plaintiff employee (or taking some other adverse action, as the case may be). *Id.* at 1023. Finally, if the defendant offers such a reason, the burden shifts once more to the plaintiff to produce evidence showing that the defendant's stated reason is mere pretext.[3] *Id.*

The Court can "skip directly to the pretext level" where, as here, the Court's analysis at the third step is dispositive of the plaintiffs' claims. *Mitchell v. Madison Dist. Pub. Schs.*, No. 23-cv-10472, 2024 WL 4884412, at *3 (E.D. Mich. Nov. 25, 2024) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394 (6th Cir. 2009)). That is, the Court "need not address whether [the Castellinis] established a prima facie case" if they "failed to

---

[3] The Court has previously expressed—and continues to hold—reservations about the tension between the burden-shifting framework and the typical purpose of summary judgment, i.e., to determine whether any issues remain for determination by jury trial. *See Burress v. Spring Grove Cemetery & Arboretum*, No. 1:18-cv-879, 2020 WL 3036047, at *9 n.4 (S.D. Ohio June 5, 2020). For example, the Sixth Circuit has noted that the elements of the burden-shifting framework typically do not apply at trial. *Id.* Rather, at trial, the only question is the ultimate question—did discrimination occur? So it is odd to ask at summary judgment whether a triable issue exists as to prima facie claim elements, or elements at other steps of the *McDonnell Douglas* framework, that will never be determined at trial. And the Court isn't alone in its consternation. *See, e.g.*, Sandra F. Sperino, *Irreconcilable:* McDonnell Douglas *and Summary Judgment*, 102 N.C. L. Rev 459 (2024); *Barrett v. Salt Lake Cnty.*, 754 F.3d 864, 867 (10th Cir. 2014) (citing Timothy M. Tymkovich, *The Problem with Pretext*, 85 Den. U. L. Rev. 503 (2008)). But in the absence of additional guidance from the higher courts, this Court must continue to apply the burden-shifting frameworks that precedent commands.

create a genuine issue of material fact as to pretext" regarding Skyline's asserted legitimate reasons for firing them. *Chen*, 580 F.3d at 402.

The Castellinis fall short on that front here. Start with Skyline's asserted reasons for firing both Castellinis. In Peter's case, Skyline explains that it fired him for "violat[ing] Skyline's drug and alcohol policy" by admitting to bringing marijuana to work. (Doc. 35, #724, 726; Doc. 23, #286–87; Doc. 33, #636). And as to Mary Ellen's dismissal, the proffered justification was to "protect the health and safety of [Tina] Smith, her daughters, and other Skyline employees" after Mary Ellen refused to transfer locations despite Smith having filed for a protective order against her. (Doc. 34, #690; Doc. 29, #555; Doc. 33, #637–38). Both strike the Court as legitimate, non-discriminatory reasons for firing employees. *See, e.g.*, *Adkins v. Excel Mining, LLC*, 214 F. Supp. 3d 617, 624 (E.D. Ky. 2016) (citing cases explaining that "[t]he violation of a company drug or alcohol policy is a legitimate, nondiscriminatory reason for firing an employee"); *Jackson v. Old Dominion Freight Line*, No. 2:16-cv-977, 2018 WL 1521764, at *7 (S.D. Ohio Mar. 28, 2018) (explaining that an employee's "serious verbal altercations" with coworkers can constitute a legitimate reason for discharge).

So then it falls to the Castellinis to show these reasons are pretextual. Plaintiffs can seek to do so in one of three ways: "(1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [Skyline's] action, or (3) the proffered reason was insufficient to motivate the action." *Adair*, 452 F.3d at 491. The Castellinis appear to opt for the second route by attempting to "indict the credibility of [Skyline's] explanation by showing circumstances which tend to prove

12

that an illegal motivation was more likely than that offered by the defendant." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (emphasis omitted) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 190 (2009)). But neither Castellini succeeds in their respective efforts.

Start with the circumstances to which Mary Ellen points to demonstrate pretext. In her telling, her tiff with Tina Smith couldn't have supplied the grounds for her firing, since she "was not suspended from work or otherwise reprimanded" until *after* she came back from her stint in the hospital. (Doc. 38, #778–79). So it was Mary Ellen's hospital stay, and not the preceding incident and its aftermath, that *truly* motivated Skyline's decision to fire her. That sounds plausible enough, but for one key detail. Mary Ellen testified that after she was discharged from the hospital and returned to work, Skyline's corporate personnel asked her if she'd like to be transferred to another store. (Doc. 25, #392). She declined that offer. (*Id.*). Only then did Skyline make the decision to terminate her. (*Id.*). Stated differently, Skyline gave Mary Ellen a chance—*after* her hospitalization—to continue working, albeit at a different store. But her refusal to transfer threatened the continuation of an untenable situation: working right beside someone (Tina Smith) who had filed a pending protection order against her (that was granted shortly thereafter). (Doc. 29, #555). So Mary Ellen's pretext argument fails because it attacks a version of events that her own testimony belies.[4]

---

[4] It bears noting that employee transfers can *themselves* constitute adverse employment actions in some instances. *See Keeton v. Flying J, Inc.*, 429 F.3d 259, 264 (6th Cir. 2005). So

Peter's pretext argument is even weaker. He argues that Skyline's asserted reason for firing him—a "violation of the alcohol and drug policy"—was pretextual because "no one observed [him] possessing or using drugs or alcohol on Skyline's premises." (Doc. 37, #758). The Court struggles to see why first-hand observation would matter when Peter *admitted* to possessing drugs on the premises. (Doc. 23, #286). So while he argues that "the facts of this case do not support the asserted

---

Mary Ellen could have potentially demonstrated pretext by arguing that it was Skyline's offer to transfer her, and not its decision to fire her, that needed justification under *McDonnell Douglas* with a legitimate, non-discriminatory reason. If she'd taken that route, then her hospitalization *would* have been adjacent to the alleged adverse employment action in the way she attempts to argue in showing pretext. Stated differently, there would be no intervening "saving grace" insulating the adverse employment action from the protected activity. But there are two issues with that. First, Mary Ellen never made any such argument. Second, and more fundamentally, the rapid-fire nature of the sequence of events, by itself, doesn't show that Skyline's proffered justification "did not actually motivate [its] action." *Adair*, 452 F.3d at 491. To make that showing, Mary Ellen must point to evidence on the basis of which a jury could find that "an illegal motivation was *more* likely than that offered by [Skyline]." *Johnson*, 319 F.3d at 866 (emphasis in original). At the very best, the intervening hospitalization, without more, makes it perhaps *equally* likely that Skyline's proffered reason was pretextual. That is especially true where, as here, Mary Ellen's workplace altercation (Skyline's proffered reason) took place mere days before her hospitalization (Mary Ellen's alleged true reason), which took place mere days before the ultimate adverse employment action. The best reading of that sequence for Mary Ellen is that Skyline had no intention to take any adverse action *until* she was hospitalized, while the best reading for Skyline is that Mary Ellen's hospitalization simply forced it to wait to take the adverse action it already intended to take before her hospitalization. But there is no evidence in the record that would enable a reasonable jury to find the first reading "more likely" than the second. Mary Ellen could've supplemented her otherwise-bare timeline argument by, for example, testifying (or eliciting testimony from others) that her hospitalization factored into Skyline's adverse employment decision(s). *Cf. Johnson*, 319 F.3d at 867–69 (describing the "several instances" of evidence creating a jury-triable issue as to whether pretext was more likely than not). Her testimony accomplishes, if anything, the exact opposite. She confirmed that her "medical condition wasn't discussed at all" when Skyline terminated her. (Doc. 25, #392). Further still, she recalled how Skyline hadn't retaliated against her the first time she was hospitalized for substance abuse treatment—in other words, supporting the notion that Skyline based its decision on something other than her hospitalization (since it had accommodated it once before). (*Id.*). At bottom, Mary Ellen hasn't offered any evidence beyond the bare fact of her hospitalization to create a genuine, jury-triable issue that Skyline's proffered justification for her termination was pretextual.

14

'legitimate reason' for [his] termination," it seems—by Peter's own testimony—that exactly the opposite is true. That is, Skyline had a legitimate, non-discriminatory reason to fire Peter: he admitted to possessing drugs on Skyline's premises in violation of the zero-tolerance substance use policy. To hold that the mere fact no one *saw* the drugs meant that Skyline's asserted justification is pretextual would be to wipe out employers' ability to rely on voluntary employee confessions of wrongdoing. The Court is aware of no caselaw that compels such a result (certainly Plaintiffs have cited none), and this Court declines to be the first.

In sum, because the Castellinis have failed to meet their burden of production to show pretext under the *McDonnell Douglas* framework, the Court **GRANTS** summary judgment to Skyline on each claim controlled by that framework.

> **2. The Castellinis' Evidence Doesn't Satisfy *Greeley*'s Prima Facie Elements, One of Which Requires Proof That Skyline Lacked an Overriding Justification for Firing Them.**

The Castellinis' *Greeley* claims (i.e., those alleging wrongful termination in violation of Ohio public policy) require a similar showing as the pretext requirement under the burden-shifting framework. Namely, one of the prima facie elements of a *Greeley* claim is that a plaintiff must show that "[t]he employer lacked overriding legitimate business justification for the dismissal." *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) (quoting *Collins v. Rizkana*, 652 N.E.2d 653, 657–58 (Ohio 1995)). So for the same reasons that the Castellinis failed on their burden-shifting claims, they fail here. That is, their own testimony provides evidence that Skyline *did* have an overriding business justification for their firings. In Peter's case,

it was his admission to having drugs on Skyline's premises. (Doc. 23, #286). And in Mary Ellen's case, it was her refusal to accept a transfer to another store after an altercation with one of her coworkers. (Doc. 25, #393). So the Court **GRANTS** Defendants summary judgment on the Castellinis' *Greeley* claims.

**B.     The Castellinis Have Not Produced Evidence to Show They Had Qualifying Disabilities Sufficient to Make a Claim For Failure to Accommodate.**

The Castellinis' remaining claims under the ADA and the OCRA allege that Skyline failed to accommodate their disabilities. Because the OCRA parallels the ADA, the Court analyzes them together. *Hentze v. CSX Transportation, Inc.*, 477 F. Supp. 3d 644, 658 n.3 (S.D. Ohio 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007)).

The ADA prohibits "discriminat[ing] against a qualified individual on the basis of disability." *Hentze*, 477 F. Supp. 3d at 658 (citing 42 U.S.C. § 12112(a)). The statute itself includes some examples of disability discrimination. One form of disability discrimination occurs when an employer "fail[s] to accommodate an employee's known disability." *Id.* (citing 42 U.S.C. § 12112(b)(5)). More specifically, "an employer violates the ADA by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability …, unless [the employer] can demonstrate that the accommodation would impose an undue hardship [on the employer.]" *Id.* at 658–59 (modifications in original) (internal quotations omitted). Those of Plaintiffs' claims that allege "failure to accommodate" fall under this theory of disability discrimination.

16

The failure-to-accommodate theory of disability discrimination requires a threshold showing that Peter and Mary Ellen had qualifying disabilities. *See Kleiber*, 485 F.3d at 869. To assess whether a person has a qualifying disability, courts ask whether the plaintiff: "(1) [has] a physical or mental impairment that substantially limits one or more major life activities; (2) [has] a record of such an impairment; or (3) [is] regarded as having such an impairment." *Martin v. Barnesville Exempted Village Sch. Dist. Bd. of Educ.*, 35 F. Supp. 2d 1038, 1040–41 (S.D. Ohio 1999). The Castellinis argue that they satisfy either the first or the third definition of "disability." The Court addresses each in turn.

1. **There is No Evidence that the Castellinis' Alleged Disabilities Substantially Limited a Major Life Activity.**

As described above, the ADA's first definition of "disability" requires that the alleged condition "must be one that substantially limits one or more major life activities." *Id.* (emphasis in original omitted). "Moreover, caselaw makes it clear that it is the plaintiff's obligation to identify both the impairment at issue and the major life activity that it impacts, along with offering an explanation as to the way in which the major life activity is substantially limited." *Hentze*, 477 F. Supp. 3d at 660.

Though the Plaintiffs have sufficiently identified their impairments, they have not offered any evidence to show that those impairments substantially limit any major life activity. Peter describes having both Asperger's syndrome and PTSD. (*See* Doc. 14, #206). Mary Ellen, too, suffers from PTSD, accompanied by depression. (*See id.*; Doc. 25, #392, 397; Doc. 38, #783). But in their depositions, both of them explicitly disclaim being limited in any major respect by those afflictions. (Doc. 23, #273–74

17

(Peter testified that he had no problem caring for himself, performing manual tasks, walking, seeing, speaking, breathing, learning, or working); Doc. 25, #367 (Mary Ellen testified the same)). Even though Plaintiffs' conditions strike the Court as the sort that *could* conceivably pose substantial limits to major life activities, the Plaintiffs here have made no showing that their impairments actually *did*. For that reason, the Court agrees with Defendants' argument that Plaintiffs have not made the requisite showing that they had qualifying disabilities for their ADA claims.

Plaintiffs push back on that resulting, noting that "the goal of the ADA, including the disability analysis, is to determine whether an employer has engaged in discrimination, not get bogged down in the nuances of defining a disability." (Doc. 37, #754 (internal quotation marks omitted)). The Court has some sympathy for that view. Indeed, this Court has recognized elsewhere that "[w]hen Congress passed the Americans with Disability Act Amendments Act in 2008, it instructed courts to interpret the term 'disability' broadly, given the ADA's remedial purpose." *Hentze*, 477 F. Supp. 3d at 660. Still, even after recognizing the broadness with which that term must be understood, the Court also explained that Congress's amendments "nonetheless left in place the requirement for a plaintiff to show that his or her impairment limits a major life activity." *Id.* (internal quotation marks omitted). Plaintiffs have abjectly failed to make any such showing here.

18

### 2. Absent a Showing of Actual Disability, the Castellinis Can't Use the "Regarded-As" Definition of Disability to Support their Failure-to-Accommodate Claims.

Perhaps recognizing their inability to show an *actual* disability given the evidence before the Court, the Castellinis argue in the alternative that Skyline *regarded* them as disabled—the ADA's third definition of "disability." (Doc. 37, #755; Doc. 38, #775). That's a better tack for them to take, since the impairments that fall into the regarded-as-disabled definition need not be of the sort that limit a major life activity. *Harrison v. Soave Ents. L.L.C.*, 826 F. App'x 517, 526 (6th Cir. 2020) (quoting 42 U.S.C. § 12102(3)(A)). But it's still a non-starter. "Where an individual meets the definition of 'disability' only under the [regarded-as-disabled] prong, … an employer need not provide a reasonable accommodation." *Stinson v. Nissan North Am., Inc.*, No. 3:18-cv-145, 2019 WL 6174841, at *9 (M.D. Tenn. Nov. 20, 2019) (citing 42 U.S.C. § 12201(h)). So even if the Court accepts that Skyline regarded the Castellinis as disabled, their claims for failure to accommodate still fail.

Therefore, the Court **GRANTS** Defendants' motions for summary judgment as to Plaintiffs' failure to accommodate claims under the ADA and the OCRA because of their failure to produce evidence showing they had disabilities qualifying for protection under those statutes.

### C. Plaintiffs' Claim for Aiding, Abetting, and Inciting of Discrimination Falls Alongside their Underlying Discrimination Claims.

Plaintiffs' last claims allege that Defendants Blake, Smith, and Schacht "aided, abetted, incited, coerced, and/or compelled Skyline Chili's discriminatory" decision to fire them in violation of Ohio Revised Code § 4112.02(J). (Doc. 14, #219, 224–25).

19

"Only a few courts have ventured to determine what elements a Plaintiff must show to make out a claim under [§ 4112.02(J)], but the courts that have examined the issue require a showing that the [defendant] employee was 'involved in or actually made the employer's decision to discriminate or retaliate against the plaintiff.'" *Schelle v. City of Piqua*, No. 3:23-cv-116, 2024 WL 4444561, at *4 (S.D. Ohio Oct. 8, 2024) (cleaned up) (quoting *Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1088 (S.D. Ohio 2022)). So any such claim "depends on a finding that retaliation [or discrimination] indeed occurred." *Id.* But, as described above, all of Plaintiffs' underlying claims fail to pass muster. That means there is nothing left for the individual Defendants to have aided, abetted, or incited. Accordingly, the Court **GRANTS** Defendants summary judgment on the claims brought under Ohio Revised Code § 4112.02(J).

## CONCLUSION

In sum, the Court **GRANTS** Defendants' Motions for Summary Judgment (Docs. 34, 35). Therefore, the Court **DIRECTS** the Clerk to enter judgment for Defendants on all claims and to **TERMINATE** this case on its docket.

**SO ORDERED.**

March 13, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**